**No. 26-1218**

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

A.R.M.R., on her own behalf and on behalf of her minor child, A.P.D.M.,

Plaintiffs-Appellants,

v.

United States of America,

Defendant-Appellee.

On Appeal from the United States District Court for the Southern District of Illinois, No. 3:24-cv-02416 (Dugan, J.)

## BRIEF FOR APPELLEE

BRETT A. SHUMATE
*Assistant Attorney General*

STEVEN D. WEINHOEFT
*United States Attorney*

DANIEL TENNY
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ... iii

STATEMENT OF JURISDICTION ... 1

STATEMENT OF THE ISSUE ... 1

PERTINENT STATUTES ... 2

STATEMENT OF THE CASE ... 2

A. Statutory Background ... 2

1. The Federal Tort Claims Act ... 2

2. The Public Health Service Act's Quarantine Authorities ... 4

B. Factual Background ... 6

1. The Federal Government Suspends Entry to the United States in March 2020 in Response to the COVID-19 Pandemic ... 6

2. Plaintiff A.R.M.R. Illegally Crosses the Border in Late March 2020 and Is Expelled ... 10

C. Prior Proceedings ... 11

SUMMARY OF ARGUMENT ... 15

STANDARD OF REVIEW ... 18

ARGUMENT ... 18

I. The Ordinary Meaning of the Term "Quarantine" in the FTCA Includes a Suspension of Entry ... 18

II. Plaintiffs Identify No Reason to Depart from the Contemporaneous Ordinary Meaning of "Quarantine" in Interpreting the FTCA .......... 28

CONCLUSION .......... 38

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Adoptive Couple v. Baby Girl*,
570 U.S. 637 (2013) .......... 32

*Allison v. Cash*,
137 S.W. 245 (Ky. 1911) .......... 22

*Augutis v. United States*,
732 F.3d 749 (7th Cir. 2013) .......... 17

*Cascabel Cattle Co. v. United States*,
955 F.3d 445 (5th Cir. 2020) .......... 14, 26, 31, 35, 36

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) .......... 2

*Hannibal & St. Joseph R.R. Co. v. Husen*,
95 U.S. 465 (1877) .......... 22

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .......... 35

*Mintz v. Baldwin*,
289 U.S. 346 (1933) .......... 24

*Molzof v. United States*,
502 U.S. 301 (1992) .......... 3, 25

*Oregon-Washington R.R. & Navigation Co. v. Washington*,
270 U.S. 87 (1926) .......... 16, 21, 24

*Raven v. Oppenheimer & Co.*,
74 F.3d 239 (11th Cir. 1996) .......... 31-32

*Smith v. St. Louis & Sw. Ry. Co.*,
181 U.S. 248 (1901) .......... 21, 22

*St. Louis Sw. Ry. Co. v. Smith*,
49 S.W. 627 (Tex. Civ. App. 1899) .................................................... 22

*United States v. Ehmer*,
87 F.4th 1073 (9th Cir. 2023) ............................................................ 32

*United States v. Melvin*,
948 F.3d 848 (7th Cir. 2020) .............................................................. 20

*United States v. Orleans*,
425 U.S. 807 (1976) ............................................................................... 2

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) ........................................................... 3

**Statutes:**

Act of Aug. 20, 1912, ch. 308,
37 Stat. 315 ........................................................................................... 24

Public Health Service Act, ch. 373,
58 Stat. 682 (1944) ................................................... 4, 5, 6, 31, 32, 33

28 U.S.C. § 1346(b) .................................................................................. 2

28 U.S.C. § 1346(b)(1) .............................................................................. 3

28 U.S.C. § 2671 ....................................................................................... 2

28 U.S.C. § 2674 ....................................................................................... 3

28 U.S.C. § 2680 ....................................................................................... 3

28 U.S.C. § 2680(a) ................................................................................ 15

28 U.S.C. § 2680(c) ................................................................................ 15

28 U.S.C. § 2680(d) ................................................................................ 31

28 U.S.C. § 2680(e) ................................................................................ 31

28 U.S.C. § 2680(f) .......... 2, 4, 14, 18, 27, 28, 35

28 U.S.C. § 2680(h) .......... 15

42 U.S.C. §§ 264-272 (1946) .......... 32

42 U.S.C. § 264(a) .......... 4

42 U.S.C. § 264(c) .......... 33

42 U.S.C. § 265 .......... 1, 4, 6, 17, 26, 30

42 U.S.C. § 268 .......... 5, 32, 34

42 U.S.C. § 268(b) .......... 9, 32

42 U.S.C. § 271 .......... 5

**Legislative Material:**

H.R. Rep. No 78-1364 (1944) .......... 4, 33

**Other Authorities:**

Atlanta Const., *Georgia Shut in By Quarantine: Proclamation Is Issued by State Board of Health* (Sep. 8, 1905) .......... 23

Balt. Sun, *Contagious Disease Found, U.S. Bars Mexican Livestock* (Dec. 28, 1946) .......... 25

9 Fed. Reg. 13,513 (1944) .......... 24

12 Fed. Reg. 5607 (1947) .......... 24-25

31 Fed. Reg. 8855 (1966) .......... 5

85 Fed. Reg. 16,559 (2020) .......... 6, 7, 34

85 Fed. Reg. 17,060 (2020) .......... 7, 8, 9, 19, 27, 32, 35, 36

85 Fed. Reg. 22,424 (2020) .......... 9

85 Fed. Reg. 31,503 (2020) .......................................................... 9

Arthur Sears Henning, *Senate to Probe Importation of Mexican Cattle: Charge Diseased Herds Peril U.S. Ranges*, Chi. Trib. (Dec. 30, 1946) .......................................................... 25

L.A. Times:
*Hawaii Raises Ban on California Stock* (June 15, 1926) ............. 23-24
*They Shall Not Pass!: California Maintains Watch at Border* (Mar. 9, 1930) .......................................................... 23

N.Y. Times, *Nassau Stiffens Polio Quarantine* (June 8, 1946) ............ 23

N.Y. Trib., *Guatemala Raises Yellow Fever Quarantine on Salvador* (July 18, 1919) .......................................................... 23

Polly J. Price, *Epidemics, Outsiders, and Local Protection: Federalism Theater in the Era of the Shotgun Quarantine*, 19 U. Pa. J. Const. L. 369 (2016) .......................................................... 23

*Quarantine*, Black's Law Dictionary 1476 (3d ed. 1933) ................. 28-29

*Quarantine*, Bouvier's Law Dictionary 1007 (1946) ............................. 29

*Quarantine*, 2 Funk & Wagnalls New Practical Standard Dictionary of the English Language 1070 (1955) .................................................... 29

*Quarantine*, Webster's New International Dictionary of the English Language (2d ed. 1949) ............................................. 16, 20, 26, 29, 35

St. Louis Post-Dispatch, *Alfalfa Weevil Quarantine* (Oct. 19, 1936) .......................................................... 23

Wash. Post, *Quarantine on Parrots Lifted by Government* (Oct. 31, 1930) .......................................................... 23

## STATEMENT OF JURISDICTION

Appellants' amended jurisdictional statement, filed on March 23, 2026, is complete and correct.

## STATEMENT OF THE ISSUE

Federal law has long provided that where a communicable disease is spreading "in a foreign country" and presents a "serious danger" of being introduced into the United States, the federal government may "prohibit, in whole or in part, the introduction of persons and property from such countries or places … in order to avert such danger." 42 U.S.C. § 265. In March 2020, as the COVID-19 pandemic began to rapidly spread around the world, the Centers for Disease Control and Prevention (CDC) exercised this authority to bar the entry of many foreign nationals arriving at our borders with Mexico and Canada. A few days later, plaintiff A.R.M.R. crossed the southern border illegally while heavily pregnant and was detained. A.R.M.R. gave birth the next day in a Texas hospital to a daughter, plaintiff A.P.D.M., and several days later was expelled to Mexico along with her daughter pursuant to the COVID-19 protection measures. Plaintiffs subsequently brought

this tort suit under the Federal Tort Claims Act (FTCA), seeking damages related to their detention and expulsion.

The issue presented is whether plaintiffs' tort claims were properly dismissed because they fall within an exception to the FTCA for suits seeking "damages caused by the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory Background

#### 1. The Federal Tort Claims Act

The United States, "as sovereign, is generally immune from suits seeking money damages." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). In 1946, Congress enacted the FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, which provides a "limited waiver" of that immunity. *United States v. Orleans*, 425 U.S. 807, 813 (1976). In the FTCA, Congress waived sovereign immunity for "claims against the United States, for money damages," for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of a federal employee "while acting within the

scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Under the FTCA, the United States is generally liable "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674.

Congress created exceptions to liability under the FTCA "to protect certain important governmental functions and prerogatives from disruption." *Molzof v. United States*, 502 U.S. 301, 311 (1992); *see* 28 U.S.C. § 2680. The exceptions "mark 'the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Molzof*, 502 U.S. at 311 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).

In the proceedings here, the United States raised multiple FTCA exceptions as barring some or all of plaintiffs' claims. The only one at issue in this appeal is the "quarantine exception" to the FTCA, which provides that the FTCA does not apply to "[a]ny claim for damages

caused by the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f).

### 2. The Public Health Service Act's Quarantine Authorities

Congress has long provided authority for the federal government to respond to public health emergencies, including a contagious disease pandemic. In 1944, Congress enacted the Public Health Service Act (PHSA), which (*inter alia*) combined and updated the powers granted to address public health emergencies. PHSA, ch. 373, 58 Stat. 682 (1944); *see* H.R. Rep. No. 78-1364, at 1 (1944) (reproduced at App. 92). Part G of the PHSA, titled "Quarantine and Inspection," contains the central authorities used to respond to public health emergencies like infectious disease pandemics. 58 Stat. at 703. For example, Section 361(a) of the PHSA—present-day 42 U.S.C. § 264(a)—provides authority to "make and enforce such regulations as … are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." *Id.*

Of particular relevance here, Section 362 (42 U.S.C. § 265) provides special authority to suspend entry of persons or property into the

United States from foreign countries to prevent the spread of communicable diseases. That section provides that when "there is serious danger of the introduction of" a "communicable disease" from "a foreign country … into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health," the Secretary of Health and Human Services (HHS)[1] "shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." 58 Stat. 704.

Section 365(b) (42 U.S.C. § 268) mandates that "customs officers" and "Coast Guard officers" are required "to aid in the enforcement of quarantine rules and regulations." 58 Stat. at 705. Finally, Section 368(a) (42 U.S.C. § 271) prescribes penalties for violations of PHSA

[1] The statute assigns the authority to the Surgeon General, but that power has since been transferred to the Secretary of HHS, and from there delegated to the CDC. Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8855 (June 25, 1966), *reprinted in* 80 Stat. 1610 (1966).

provisions and their implementing regulations, including Sections 361 and 362. *Id.* at 706.

## B. Factual Background

### 1. The Federal Government Suspends Entry to the United States in March 2020 in Response to the COVID-19 Pandemic

On March 20, 2020, in response to the rapidly spreading COVID-19 pandemic, the CDC exercised its delegated authority to issue an interim final rule setting forth procedures for implementing 42 U.S.C. § 265's suspension of entries into the United States. *Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes*, 85 Fed. Reg. 16,559 (Mar. 24, 2020). The rule's preamble explained that international travel increases the risk of communicable disease transmission into and through the United States, particularly "when travelers are in congregate settings." *Id.* at 16,560. The rule's preamble also emphasized that the COVID-19 pandemic illustrated the need for this authority, observing that "[d]espite the unprecedented global efforts at mitigating or slowing the transmission of COVID-19, cases of COVID-19 have rapidly propagated and

multiplied, crossing international borders with ease," with numerous cases resulting from infections in foreign countries, and that at the time there was "no vaccine, therapeutic, or rapid testing for the disease." *Id.* at 16,562.

On the same day, the CDC and HHS issued an order pursuant to the interim final rule temporarily suspending the introduction of certain aliens traveling from Canada and Mexico into the United States. *Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 17,060 (Mar. 26, 2020). The order applied to "covered aliens," defined as aliens "traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting" at or near the border, "typically aliens who lack valid travel documents." *Id.* at 17,061.[2] The order explained that, under typical procedures, covered aliens may spend hours or days in congregate settings while undergoing

[2] As this definition implies, this order excluded certain classes of aliens, such as legal permanent residents, aliens who arrived at a port of entry with valid travel documents, or aliens arriving who are from a country eligible for the visa waiver program. 85 Fed. Reg. at 17,061.

immigration processing, and that holding covered aliens in congregate settings risks the spread of COVID-19 to Customs and Border Protection (CBP) personnel and further transmission of COVID-19 to the U.S. population. *Id.* In addition, congregate facilities are not designed or equipped to isolate individuals or provide treatment for COVID-19, such that care would need to be provided by "local or regional health care providers." *Id.* That "would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID-19," while undermining a "critical component of the Federal government's overall public health response to COVID-19," which focused on "[t]he continuing availability of healthcare resources to the domestic population." *Id.* And the release of those individuals into the United States and their subsequent movement around the country would cause "an increase in the serious danger of the introduction of COVID-19 into the interior of the country." *Id.*

In light of these concerns, the CDC determined that it was "necessary for the public health to immediately suspend the

introduction of covered aliens," and that the suspension required moving "all such aliens to the country from which they entered the United States, or their country of origin, or another location as practicable, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances," as speedy removal would "lower the risk the alien poses of introducing, transmitting, or spreading COVID-19" in congregate settings and the United States in general. 85 Fed. Reg. at 17,067.

Invoking the statutory requirement that "customs officers … aid in the enforcement of quarantine rules and regulations," 42 U.S.C. § 268(b), CDC also requested the assistance of the Department of Homeland Security (DHS) in implementing the March 2020 order, as CDC lacked the capability and resources to do so on its own. 85 Fed. Reg. at 17,067; *see id.* at 17,061.[3]

---

[3] The March 2020 CDC Order was extended and/or amended by subsequent orders—all of which were implemented after the events at issue in this suit—because of the continued serious public-health risks posed by COVID-19. *See, e.g.*, *Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 22,424 (Apr. 22, 2020); *Amendment and Extension of Order Under Sections 362 and 365 of the Public Health*

*Continued on next page.*

### 2. Plaintiff A.R.M.R. Illegally Crosses the Border in Late March 2020 and Is Expelled

Plaintiff A.R.M.R. is a Honduran national. App. 51. The operative complaint alleges that on March 30, 2020, A.R.M.R. crossed the border illegally near Hidalgo, Texas, along with an adult male (identified in the complaint as F.J.D.L.) and their three-year-old son, D.J.D.M. App. 56. At the time she crossed the border, A.R.M.R. was heavily pregnant, and when Border Patrol agents encountered A.R.M.R. and her family, they initially called for an ambulance to evaluate A.R.M.R. App. 57. After medical staff concluded A.R.M.R. did not require hospitalization, Border Patrol agents moved A.R.M.R. and her family to an immigration detention facility near McAllen, Texas. *Id.* The next day—March 31—A.R.M.R. went into labor and was admitted to a hospital in McAllen, where she gave birth to a daughter, A.P.D.M., on April 1. *Id.* On April 2, A.R.M.R. and A.P.D.M. were discharged from the hospital and returned to the immigration detention facility. App. 58. A.R.M.R. and

---

*Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 31,503 (May 26, 2020).

her family remained in the facility for four days before being expelled to Reynosa, Mexico, on April 6. App. 59.

A.R.M.R. alleges that while in immigration detention, both she and F.J.D.L. told CBP agents that they feared persecution or torture if returned to Honduras, but were not given the opportunity to apply for asylum. App. 58, 60. A.R.M.R. also alleges that she and F.J.D.L. asked for information about registering A.P.D.M. as a U.S. citizen, but that they were told that they could not do so. App. 59.

A.R.M.R. and her family remained in Mexico until March 30, 2021, when they were paroled into the United States. App. 61. A.R.M.R. and A.P.D.M. currently reside in Illinois. App. 51.

### C. Prior Proceedings

A.R.M.R. brought this suit on behalf of herself and her minor daughter, A.P.D.M. App. 49. The complaint brought seven claims—claims for false imprisonment of A.P.D.M. and A.R.M.R. (Counts I and II, respectively); a claim by A.R.M.R. for negligence based on the argument that she had been expelled without first receiving a "fear screening" based on a fear of persecution or torture in her home country (Count III); a negligence claim by both plaintiffs premised on their

expulsion to Mexico, which plaintiffs asserted put them at risk (Count IV); a negligence claim by A.R.M.R. regarding an alleged failure to return certain belongings (Count V); a negligence claim by both plaintiffs based on their assertion that government agents had provided incorrect information about obtaining a birth certificate for A.P.D.M. (Count VI); and an intentional infliction of emotional distress claim by both plaintiffs (Count VII). App. 61-65.

The district court held that all of the claims were barred by the FTCA's quarantine exception. The court looked to the ordinary meaning of the term "quarantine" "when the statute was enacted." App. 19 (quotation omitted). Drawing on five different dictionaries contemporaneous with the enactment of the FTCA, App. 19-21, the court observed that "quarantine was understood to encompass a range of measures aimed at preventing the spread of disease, such as excluding, restraining, or detaining persons and goods suspected of carrying contagion," App. 22. The March 2020 order "fit[] within that framework" by compelling individuals to remain outside the United States, thus "mirror[ing] … traditional quarantine practices … such as prohibiting a ship from landing and detaining its occupants offshore."

*Id.* And the March 2020 order shared the same "historic goal of quarantine laws, which were directed not only at those already infected, but at preventing a contagion from crossing the borders in the first place." *Id.* The court thus rejected plaintiffs' assertion that "quarantine" was "narrowly limited to isolating infected persons," App. 19, as the term instead "unambiguously includes measures directed at persons for the purpose of preventing the introduction or spread of a potential contagion," App. 23.

The district court also rejected plaintiffs' attempts to derive support for their reading of "quarantine" in the FTCA from specific uses of the term "quarantine" in the PHSA and its implementing regulations. App. 24. To the extent plaintiffs sought to rely on language in "regulations implemented after the FTCA and the quarantine exception were enacted," the court explained that regulations "promulgated under a separate statutory scheme as a later date" are not "relevant to interpreting the FTCA." App. 24-25; *see* App. 28 (explaining that "CDC regulations cannot override" Congress's determinations in the FTCA).

As for the PHSA itself, the district court explained that the FTCA and PHSA "are not part of the same scheme" and do not "cross-

reference each other," and there was thus no basis for concluding that the two statutes must use the term in precisely the same way. App. 24. And in any event, to the extent that the PHSA is relevant, "its provisions undermine Plaintiffs' arguments," as the authority to bar entry "is placed within the 'Quarantine and Inspection' subchapter of the PHSA" alongside other quarantine measures, indicating that "Congress viewed the 'suspension of entries and imports' as a form of quarantine power." App. 26 (citation omitted). The court also noted that the March 2020 order invoked the PHSA's requirement that "customs officers … aid in the enforcement of quarantine rules and regulations." App. 27 (quotation omitted).

The district court also concluded that plaintiffs' claims were for damages "caused by" the quarantine. 28 U.S.C. § 2680(f). The court explained that whether a claim is "caused by" a quarantine incorporates concepts of proximate causation and thus "reasonable foreseeability." App. 29 (quoting *Cascabel Cattle Co. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020)). Here, plaintiffs' claims stem from allegations "that they were injured when CBP officers wrongfully detained and expelled them from the United States and mishandled paperwork during the

expulsion process." App. 30. All of "the acts that allegedly harmed Plaintiffs" thus flowed from the enforcement of the March 2020 order. *Id.*

The district court separately held that other exceptions to the FTCA required dismissal of three of the seven claims (Counts II, V, and VI). App. 48. The court held that the "discretionary function" exception, 28 U.S.C. § 2680(a), precluded A.R.M.R.'s false imprisonment claim. App. 34-39. The court further held that the FTCA's "detention of goods" exception, 28 U.S.C. § 2680(c), barred A.R.M.R.'s claim based on a failure to return her belongings. App. 39-44. And the court held that the FTCA's "misrepresentation exception," 28 U.S.C. § 2680(h), barred a claim based on alleged erroneous statements by federal employees about how and when A.P.D.M. could obtain a birth certificate. App. 44-47. The court declined to rule on various other arguments the United States pressed in its motion to dismiss. App. 47-48.

## SUMMARY OF ARGUMENT

The district court correctly recognized that the ordinary meaning of the term "quarantine" as used in the FTCA encompasses a broad range of measures designed to prevent the introduction or spread of disease,

including a suspension of entry into the United States by persons travelling from places where communicable diseases are spreading. Dictionary definitions reflect that the term "quarantine" includes "any forced stoppage of travel, communication, or intercourse, due to contagions or infections or the spreading of plant and animal pests on land or by sea," App. 78 (*Quarantine*, Webster's New International Dictionary of the English Language 2033 (2d ed. 1949)), and the Supreme Court used the term in the same way, explaining that "it is well settled that a state, in the exercise of its police power, may establish quarantines against human beings, or animals, or plants, the coming in of which may expose the inhabitants, or the stock, or the trees, plants, or growing crops, to disease, injury, or destruction thereby," *Oregon-Washington R.R. & Navigation Co. v. Washington*, 270 U.S. 87, 93 (1926). Other legal and popular sources contemporaneous with the enactment of the FTCA likewise reflected use of the term "quarantine" to describe suspensions of entry of individuals or importation of goods from places where diseases were spreading. And the action at issue here fits comfortably within that ordinary meaning: the CDC suspended entry by covered aliens at borders with Mexico and

Canada because COVID-19 was spreading in those countries to address the risk that those aliens would spread COVID-19 in congregate settings or in the interior of the United States and would strain local healthcare resources.

Plaintiffs' constricted definition of "quarantine" as encompassing only "the enforced isolation of an infected person," Br. 11, cannot be squared with contemporary dictionary definitions or common usage. Their reliance on the PHSA—the statute that contains the quarantine authority used to suspend entry here, 42 U.S.C. § 265—is likewise misplaced. Even aside from the fact that the PHSA does not control the meaning of the term "quarantine" in the FTCA, all relevant indications are that Congress understood the suspension of entry power in the PHSA as part of the quarantine authorities of the federal government. And plaintiffs' assertion that meaning of the FTCA's quarantine exception, adopted in 1946, is determined by the CDC's use of the term "quarantine" in some regulatory statements in 2020 is incorrect; agencies cannot expand or contract the ordinary meaning of the terms Congress enacted.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss de novo. *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013).

## ARGUMENT

### I. The Ordinary Meaning of the Term "Quarantine" in the FTCA Includes a Suspension of Entry

The quarantine exception to the FTCA bars "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f). The district court correctly held that plaintiffs' claims here—which all stem from their detention and subsequent expulsion from the United States in response to the COVID-19 pandemic—were barred by this exception. The ordinary meaning of the term "quarantine" as used in the FTCA encompasses a wide range of measures designed to prevent the introduction or spread of disease, including bars on the entry of persons or the importation of goods from areas where disease is spreading. The March 2020 order that was applied to plaintiffs fits comfortably within that ordinary meaning, as it suspended entry to prevent the introduction and spread of COVID-19 into the United States.

A. In March 2020, the United States was faced with a rapidly spreading COVID-19 pandemic that threatened to overwhelm domestic healthcare resources and could be stemmed only by measures like physical isolation that the country's border posts could not implement. The CDC thus issued an order barring many individuals from entering the United States at our borders with Mexico and Canada and directing the swift return of those who crossed illegally. The CDC explained that the order was necessary to minimize the risk of transmission created by time spent in congregate settings near the border and the strain on local healthcare resources. 85 Fed. Reg. at 17,061, 17,066-67. The CDC further explained that if those individuals were released into the United States, their release and subsequent movement within the United States would cause "an increase in the serious danger of the introduction of COVID-19 into the interior of the country." *Id.* at 17,061.

The district court correctly held that the March 2020 order established a "quarantine" within the meaning of the FTCA, and that plaintiffs' claims—which all stem from that quarantine—are barred by the FTCA's quarantine exception. The FTCA does not define the term

"quarantine." Accordingly, the term is given its ordinary meaning at the time of enactment, often determined "by referencing contemporary dictionaries," and is construed in light of the "language and design of the statute as a whole." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) (quotation omitted).

As the district court extensively documented (App. 19-21), dictionaries contemporaneous to the 1946 enactment of the FTCA defined "quarantine" to encompass a wide variety of restrictions imposed to prevent the spread or introduction of disease. The second edition of Webster's New International Dictionary of the English Language in 1949, for example, explained that although the term initially denoted a fixed period of time when a ship "suspected of being infected with a malignant contagious disease, is obliged to forbear all intercourse with the shore," the term was "[n]ow" used "in a wider sense" to refer to "any forced stoppage of travel, communication, or intercourse, due to contagions or infections or the spreading of plant and animal pests on land or by sea." App. 78 (*Quarantine*, Webster's New International Dictionary of the English Language 2033 (2d ed. 1949)).

Both legal and popular sources reflected the wide range of restrictions that were termed "quarantines." As early as the turn of the twentieth century, the Supreme Court reflected that breadth in explaining that "[t]he prevention of disease is the essence of a quarantine law," and that such a law "is directed, not only to the actually diseased, but to what has become exposed to disease." *Smith v. St. Louis & Sw. Ry. Co.*, 181 U.S. 248, 255-56 (1901). Quarantine regulations encompassed, among others, measures that entirely barred travel or importation from a place infected with disease. In *Oregon-Washington Railroad & Navigation Co. v. Washington*, for example, the Supreme Court considered the validity of Washington regulations that barred the importation into Washington of products that could carry alfalfa weevil from six other states where that pest was present. 270 U.S. 87, 90-91 (1926). The Court explained that "it is well settled that a state, in the exercise of its police power, may establish quarantines against human beings, or animals, or plants, the coming in of which may expose the inhabitants, or the stock, or the trees, plants, or growing crops, to disease, injury, or destruction thereby," even though "such quarantines necessarily affect interstate commerce." *Id.* at 93.

The Court could describe that principle as "well-settled" because it drew on an extensive prior jurisprudence on quarantine regulations, including cases addressing state bans on the importation of livestock or crops from other states that sought to distinguish between "what is necessary for any proper quarantine" and exercises of that power that unduly restricted interstate commerce. *Smith*, 181 U.S. at 255-56 (emphasis omitted) (upholding Texas regulations barring importation of cattle from Louisiana, where anthrax was spreading); *see Hannibal & St. Joseph R.R. Co. v. Husen*, 95 U.S. 465, 473 (1877) (holding that a state statute barring importation of cattle from other states at particular times of year was "not a quarantine law" because it was not tied to disease).

Before enactment of the FTCA, states and localities commonly imposed measures barring or restricting travel in response to infectious disease, and such measures were recognized as "quarantine" measures. As one state court put the point, "our state and other states almost annually quarantine against cities and even states in which may be raging some contagious and deadly disease," including by "absolutely restrict[ing] immigration for the time being from such infected

districts." *St. Louis Sw. Ry. Co. v. Smith*, 49 S.W. 627, 632 (Tex. Civ. App. 1899); *see Allison v. Cash*, 137 S.W. 245, 246 (Ky. 1911) (describing "quarantine" by Eddyville that forbid "all passing" from Kuttawa, where smallpox was spreading); *see generally* Polly J. Price, Epidemics, Outsiders, and Local Protection: Federalism Theater in the Era of the Shotgun Quarantine, 19 U. Pa. J. Const. L. 369, 376-94 (2016) (describing history of quarantines barring entry into states or towns of persons from areas where yellow fever was spreading). Newspaper accounts likewise employed "quarantine" to describe such measures.[4]

Bars on the importation of animals or crops from areas where diseases were spreading were likewise referred to as "quarantines."[5] In

---

[4] *See, e.g.*, *Nassau Stiffens Polio Quarantine*, N.Y. Times, June 8, 1946, at 5 (stating that Bahamas had imposed a polio "quarantine against Florida and Cuba" that barred children from "enter[ing] the Bahamas from these areas"); *Guatemala Raises Yellow Fever Quarantine on Salvador*, N.Y. Trib., July 18, 1919, at 3 (noting lifting of "quarantine against land and maritime travel" from infected area); *Georgia Shut in By Quarantine: Proclamation Is Issued by State Board of Health*, Atlanta Const., Sep. 8, 1905, at 2 (describing "[q]uarantine of the entire state against all points infected with yellow fever" that prohibited entry into the state from infected areas).

[5] *See, e.g.*, *Alfalfa Weevil Quarantine*, St. Louis Post-Dispatch, Oct. 19, 1936, at 8A (stating that Missouri had "established a quarantine against the importation of alfalfa" from areas in other states where

*Continued on next page.*

1912, as part of a statute that soon became colloquially known as the Plant Quarantine Act, the Secretary of Agriculture was granted authority to "forbid the importation into the United States" of fruits, vegetables, and other plants to prevent the "introduction" of diseases or insect pests, and Congress expressly made those "quarantine provisions" applicable to three such threats. Act of Aug. 20, 1912, ch. 308, § 7, 37 Stat. 315, 317-18 (making "quarantine provisions" applicable to "white-pine blister rust, potato wart, and the Mediterranean fruit fly," effective on passage); *see Mintz v. Baldwin*, 289 U.S. 346, 351 (1933). The Plant Quarantine Act thus made "a complete provision for quarantine against importation into the country." *Oregon-Washington R.R.*, 270 U.S. at 99. Federal regulations implementing the Act reflected the same usage of "quarantine." *See, e.g.*, *Foreign Quarantine Notices—Pink Bollworm of Cotton*, 9 Fed. Reg.

---

alfalfa weevil was spreading); *Quarantine on Parrots Lifted by Government*, Wash. Post, Oct. 31, 1930, at 3 (describing end of "quarantine against parrots"); *They Shall Not Pass!: California Maintains Watch at Border*, L.A. Times, Mar. 9, 1930, at I8 (describing California's "quarantine" against the importation of multiple types of produce from other states); *Hawaii Raises Ban on California Stock*, L.A. Times, June 15, 1926, at A2 (reporting end of "quarantine against the importation of California live stock" into Hawaii).

13,513, 13,513-15 (Nov. 11, 1944) (describing and amending "quarantine" in place since 1913 that barred importation of "cottonseed and cottonseed hulls from all foreign localities and countries"); *Foreign Quarantine Notices—Citrus Nursery Stock Quarantine*, 12 Fed. Reg. 5607, 5607-09 (Aug. 21, 1947) (establishing "quarantine" barring importation of plants that could carry citrus canker). Indeed, in 1946—the same year the FTCA was enacted—political debate raged over the imposition, removal, and re-imposition of a "quarantine" that barred the importation of Mexican livestock while hoof-and-mouth disease was spreading in that country. *See, e.g.*, *Contagious Disease Found, U.S. Bars Mexican Livestock* (Balt. Sun Dec. 28, 1946), at 7 (describing order that would "reimpose the quarantine on importation"); Arthur Sears Henning, *Senate to Probe Importation of Mexican Cattle: Charge Diseased Herds Peril U.S. Ranges* (Chicago Tribune Dec. 30, 1946), at 7 (describing prior lifting of "quarantine against cattle from Mexico").

Applying that same ordinary meaning is particularly appropriate in the context of the FTCA. The FTCA's exceptions reflect Congress's judgment that "certain important governmental functions and prerogatives" should be protected from the "disruption" that could

accompany the threat of tort liability. *Molzof v. United States*, 502 U.S. 301, 311 (1992). In attempting to contain the introduction or spread of a contagious disease, which often includes acting under uncertain and evolving circumstances, Congress has ensured that the federal government can "exercise its discretion in this sensitive area free from fear of litigation." *Cascabel Cattle Co. v. United States*, 955 F.3d 445, 452 (5th Cir. 2020). And that is especially apparent here, where the CDC concluded that the situation in March 2020 was so serious as to warrant a suspension of all entry by covered aliens into the United States to prevent the introduction and spread of a new and contagious disease. *See* 42 U.S.C. § 265 (allowing suspensions of entry where there is a "serious danger of the introduction" of a disease present in a foreign country into the United States).

All interpretive tools thus make clear that the ordinary meaning of the term "quarantine" in the FTCA encompasses a wide range of measures restricting travel or trade to prevent the spread of disease—in short, "any forced stoppage of travel, communication, or intercourse, due to contagions or infections or the spreading of plant and animal pests on land or by sea." App. 78 (*Quarantine*, Webster's New

International Dictionary of the English Language 2033 (2d ed. 1949)). That ordinary meaning "unambiguously includes measures directed at persons for the purpose of preventing the introduction or spread of a potential contagion," App. 23, including measures barring or suspending entry from an area where disease is spreading. That is exactly what occurred here: given evidence that "COVID-19 exist[ed] in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land borders with Canada and Mexico"; that many individuals crossing into the United States from those countries would be held in congregate settings where disease transmission would more easily occur and would tax local healthcare resources; and that the travel of those individuals into the interior of the United States would seriously increase the risk of spreading COVID-19 in the United States, the CDC imposed restrictions on entering the United States to prevent the spread of disease. 85 Fed. Reg. at 17,061; *see id.* at 17,063-65 (documenting COVID-19 cases in Canada and Mexico). The March 2020 order thus falls within the FTCA's exception for "the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f).

Plaintiffs here brought seven tort claims, three of which were also dismissed on other grounds that are not challenged here. App. 48. It follows from the above analysis that plaintiffs' four remaining claims—which relate to their detention and expulsion to Mexico—are claims "for damages caused by" the quarantine. 28 U.S.C. § 2680(f). As the district court explained, those claims depend entirely on allegations that plaintiffs "were injured when CBP officers wrongfully detained and expelled them from the United States," and plaintiffs "were only detained and expelled because CBP officers were executing the March 2020 Order." App. 30.

## II. Plaintiffs Identify No Reason to Depart from the Contemporaneous Ordinary Meaning of "Quarantine" in Interpreting the FTCA

A. Plaintiffs assert that the district court erred in rejecting their narrow definition of a "quarantine" as limited to "the enforced isolation of an infected person." Br. 11; *see* Br. 13 ("compulsory isolation based on infection"). But that constricted reading finds no purchase in either dictionary definitions or markers of contemporary ordinary meaning. For one, the dictionary definitions plaintiffs cite—and on which the district court relied—make clear that quarantines can apply to all

individuals arriving from places "where a contagious or infectious disease is prevalent," regardless of whether they themselves are infected or showing symptoms. App. 69 (*Quarantine*, Black's Law Dictionary 1476 (3d ed. 1933)); *see* App. 75 (*Quarantine*, Bouvier's Law Dictionary 1007 (1946)) ("coming from a port or place infected or supposed to be infected"); App. 90 (*Quarantine*, 2 Funk & Wagnalls New Practical Standard Dictionary of the English Language 1070 (1955)) ("arriving from places infected with contagious disease").

Those same definitions likewise do not confine "quarantine" to "enforced isolation" of a "person." They instead recognize that "quarantine" refers to measures effecting a "forced stoppage of travel, communication, or intercourse," including as applied to livestock or crops, App. 78 (*Quarantine*, Webster's New International Dictionary of the English Language 2033 (2d ed. 1949)), or generally the isolation "of any person *or place* infected with contagious disease," App. 90 (*Quarantine*, 2 Funk & Wagnalls New Practical Standard Dictionary of the English Language 1070 (1955)) (emphasis added), or laws designed to "prevent[], as far as human means can prevent it, the introduction … of contagious and infectious diseases," App. 75 (*Quarantine*, Bouvier's

Law Dictionary 1007 (1946)). Plaintiffs' constricted reading of the term "quarantine" thus derives no support from the dictionary definitions they cite.

B. Plaintiffs' other arguments largely hinge on the PHSA, and especially 42 U.S.C. § 265, the provision of the PHSA that was invoked in issuing the March 2020 order. As the district court correctly explained, the PHSA is of limited relevance in interpreting the scope of the term "quarantine" in the FTCA. And to the extent it bears on that interpretive question, the PHSA supports reading the term "quarantine" in the FTCA consistent with its ordinary meaning, rather than as limited to "the enforced isolation of an infected person." Br. 11.

1. At the outset, "there is little justification for concluding that the PHSA has any relevance to deciphering the meaning of terms used in the FTCA," as the two statutes "are not part of the same scheme" and do not "cross-reference each other." App. 24. Plaintiffs do not contend otherwise, instead asserting that the FTCA was enacted against "the immediate backdrop of the PHSA," which "comprehensively addressed quarantine and inspection authorities." Br. 15. But the PHSA is just one statute conferring quarantine powers on the federal government.

Other statutes—such as the Plant Quarantine Act—likewise provided authority to implement measures to control the spread of disease that were referred to as "quarantines." The FTCA's quarantine exception applies to *all* exercises of quarantine authority, not just those found in the PHSA. *See, e.g.*, *Cascabel Cattle*, 955 F.3d at 451-53 (applying exception to cattle quarantine). And while Congress in some other FTCA exceptions specifically identified statutes to be consulted in construing the exceptions' scope, *see* 28 U.S.C. § 2680(d), (e), it did not cite the PHSA (or any other statute) in the quarantine exception.

2. In any event, to the extent the PHSA is relevant, it only underscores that the quarantine exception applies here. The authority relied on here falls within a part of the PHSA entitled "Quarantine and Inspection." 58 Stat. at 703. As the district court recognized, that title illustrates that Congress understood § 265, like other provisions of the same part, "as a form of quarantine power, designed to operate alongside the CDC's other statutory tools for preventing the introduction and spread of communicable disease." App. 26. Plaintiffs' suggestion that § 265 merely involves "inspection" ignores the suspension of entry element that is at issue here. And the "Quarantine

and Inspection" heading, unlike the various headings of other sections of the PHSA on which plaintiffs rely (Br. 19-20), was enacted by Congress and not merely inserted by codifiers of the U.S. Code. S*ee Raven v. Oppenheimer & Co.*, 74 F.3d 239, 243 & n.8 (11th Cir. 1996) (per curiam) (headings "may be employed as tools of interpretation" "only when" they are "part of the act as written and passed by Congress and not added by those responsible for codification"); *see also Adoptive Couple v. Baby Girl*, 570 U.S. 637, 648 n.5 (2013); *United States v. Ehmer*, 87 F.4th 1073, 1112 (9th Cir. 2023). *Compare* 58 Stat. at 703-06, *with* 42 U.S.C. §§ 264-272 (1946).

In addition, as the district court correctly observed, the March 2020 order was issued in part under the authority of 42 U.S.C. § 268 (Section 365 of the PHSA), which directs "customs officers … to aid in the enforcement of quarantine rules and regulations." 42 U.S.C. § 268(b); *see* App. 27; 85 Fed. Reg. at 17,061, 17,067; App. 57-60 (complaint alleging that CBP agents detained and expelled plaintiffs). This express statutory authority likewise confirms that the actions at issue here fall within the broad definition of "quarantine."

Moreover, plaintiffs' reliance, in both the text of the PHSA and its headings, on the use of various other terms to describe the powers invoked here merely repeats plaintiffs' error of treating "'suspensions' of entry and importation" as "distinct from traditional quarantine powers." Br. 15; *see* Br. 17, 18. As just discussed, that is a false dichotomy: "suspensions of entry or importation" were common uses of quarantine powers, were described as such in both legal and popular sources in the decades leading up to the enactment of the FTCA, and fall within contemporary definitions of the term. *See supra* pp. 20-25.

Plaintiffs' reliance on the legislative history of the PHSA (Br. 15-16) is likewise mistaken. Plaintiffs identify no portion of the legislative history drawing a distinction between the power to suspend entry or importation and "quarantine" powers, much less suggesting that "quarantine" has the limited meaning they ascribe it. They include just one quotation from the legislative history (Br. 16), which refers to a different section of the PHSA (42 U.S.C. § 264(c), Section 361(c) of the PHSA), and in any event merely provides a description of the authority in that section that does not opine one way or the other on whether it

would properly be characterized as a "quarantine." *See* H.R. Rep. 78-1364, at 24 (reproduced at App. 115); 58 Stat. at 703.

C. Plaintiffs' remaining arguments are even further afield. They contend at length (Br. 23-28) that the text of the March 2020 order and the related interim final rule issued by the CDC do not refer to the suspension of entry as a "quarantine," and use the term "quarantine" in a narrower sense to refer to self-isolation or other measures. But the interpretive question here is whether the ordinary meaning of "quarantine" in 1946, when the FTCA was enacted, included a suspension of entry to prevent the spread of disease. Whether the CDC used the word "quarantine" to describe its exercise of § 265 authority in 2020 has no bearing on that interpretive question, as regulations "promulgated under a separate statutory scheme at a later date" are not "relevant to interpreting the FTCA." App. 24-25. The subsequent actions or statements of an administrative agency agencies cannot expand or contract the ordinary meaning of the terms Congress enacted. And in any event, as noted, the CDC invoked the statutory duty of customs officials "to aid in the enforcement of quarantine rules and regulations," 42 U.S.C. § 268(b), and in fact included "Foreign

Quarantine" in the title of the interim final rule implementing § 265, 85 Fed. Reg. at 16,559.

Plaintiffs' related assertion that "quarantine" cannot include "expulsion" (Br. 23, 30) likewise misses the point. At the outset, the dictionary definitions discussed above make clear that the term "quarantine" can likewise be applied to "measures taken to enforce" a quarantine. App. 78 (*Quarantine*, Webster's New International Dictionary of the English Language 2033 (2d ed. 1949)). But even if that were not so, the FTCA exception applies not solely to a "quarantine," but to claims arising from "imposition or establishment of a quarantine." 28 U.S.C. § 2680(f). The exception thus precludes claims based on "the manner in which the quarantine is carried out and enforced." *Cascabel Cattle*, 955 F.3d at 451. Here, expulsion was necessary because the alternatives—continued detention in congregate settings not equipped to prevent the spread of COVID-19 or release into the interior of the United States—would have resulted in precisely the risk of spreading disease that the suspension of entry was designed to prevent. 85 Fed. Reg. at 17,067. Indeed, as the D.C. Circuit observed, the power conferred by § 265 "could be rendered largely nugatory if the

Executive could not take any action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022). Expulsion was thus integral to how the quarantine was "carried out and enforced," *Cascabel Cattle*, 955 F.3d at 451, and plaintiffs' claims fall within the exception.

Plaintiffs' related contention that their detention and expulsion was not the product of a "quarantine" because "they were processed like any other family in immigration custody" without experiencing "special processes tied to their time of entry, health status, or possible exposure, Br. 31, similarly misses the mark. A central premise of the March 2020 order was that a suspension of entry—and corresponding expulsions for those who violated that suspension of entry—was necessary precisely because border stations were not equipped to provide the sort of "isolation" or ability to segregate individuals for a "defined period of time associated with disease incubation or observation" that plaintiffs urge should have marked their detention. Br. 33; *see* 85 Fed. Reg at 17,066 ("[Ports of Entry] and Border Patrol stations are not structured or equipped to implement quarantine, isolation, or social distancing

protocols on site for COVID-19 for even small numbers of aliens, much less dozens or hundreds of them together with CBP personnel."). It is unsurprising that A.R.M.R., having illegally crossed the border only days after the March 2020 order went into effect, experienced exactly the conditions that CDC concluded necessitated the order and related implementing actions in the first place.

Finally, plaintiffs urge (Br. 21-23) that the district court erred in inferring that they were expelled pursuant to the quarantine effected by the March 2020 order. But that conclusion is inescapable from plaintiffs' own allegations. Plaintiffs' complaint details at length both the March 2020 order, related actions by the CDC, and the implementation of those actions by CBP, App. 52-56, and it is undisputed that the March 2020 order and related actions took effect before A.R.M.R. crossed the border. Plaintiffs also expressly allege that they were told they were expelled "due to COVID-19." App. 52-56, 58. Plaintiffs' specific claims likewise repeatedly reference the "Title 42 Order." App. 61-62. And in district court, plaintiffs argued—in a claim abandoned on appeal—that because of A.R.M.R.'s recent labor, certain exceptions to the March 2020 order and its implementing guidance

should have precluded CBP from expelling her. Dkt. 26, at 11. Plaintiffs cannot now cast doubt on whether the March 2020 order was the basis for their expulsion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

STEVEN D. WEINHOEFT
*United States Attorney*

DANIEL TENNY

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

June 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,165 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

# ADDENDUM

## TABLE OF CONTENTS

28 U.S.C. § 2680 .......... A1

42 U.S.C. § 265 .......... A3

42 U.S.C. § 268 .......... A4

**28 U.S.C. § 2680**

**§ 2680. Exceptions**

The provisions of this chapter and section 1346(b) of this title shall not apply to—

**(a)** Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

**(b)** Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter.

**(c)** Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer, except that the provisions of this chapter and section 1346(b) of this title apply to any claim based on injury or loss of goods, merchandise, or other property, while in the possession of any officer of customs or excise or any other law enforcement officer, if—

**(1)** the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense;

**(2)** the interest of the claimant was not forfeited;

**(3)** the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and

**(4)** the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law.

**(d)** Any claim for which a remedy is provided by chapter 309 or 311 of title 46 relating to claims or suits in admiralty against the United States.

**(e)** Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1–31 of Title 50, Appendix.

**(f)** Any claim for damages caused by the imposition or establishment of a quarantine by the United States.

**[(g)** Repealed]

**(h)** Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

**(i)** Any claim for damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system.

**(j)** Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.

**(k)** Any claim arising in a foreign country.

**(l)** Any claim arising from the activities of the Tennessee Valley Authority.

**(m)** Any claim arising from the activities of the Panama Canal Company.

**(n)** Any claim arising from the activities of a Federal land bank, a Federal intermediate credit bank, or a bank for cooperatives.

**42 U.S.C. § 265**

**§ 265. Suspension of entries and imports from designated places to prevent spread of communicable diseases**

Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

**42 U.S.C. § 268**

**§ 268. Quarantine duties of consular and other officers**

**(a)** Any consular or medical officer of the United States, designated for such purpose by the Secretary, shall make reports to the Surgeon General, on such forms and at such intervals as the Surgeon General may prescribe, of the health conditions at the port or place at which such officer is stationed.

**(b)** It shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations; but no additional compensation, except actual and necessary traveling expenses, shall be allowed any such officer by reason of such services.